## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY THOMAS,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | **No. 12-3250** |
| **Defendant.** | : | |

### MEMORANDUM

**Schiller, J.**                                                          **September 30, 2013**

Larry Thomas sued the City of Philadelphia ("City") for race-based employment discrimination pursuant to 42 U.S.C. § 1983 and the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951 *et seq*. Plaintiff worked for the Philadelphia Water Department ("PWD"), a department of the City, until his retirement in June, 2010. Plaintiff contends that his retirement was the result of racial discrimination by Defendant. Before the Court is Defendant's Motion for Summary Judgment. For the following reasons, the Court grants Defendant's Motion for Summary Judgment with respect to both of Plaintiff's claims.

## I.     BACKGROUND

Plaintiff is an African-American man who was employed by the PWD. (Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. [hereinafter Def.'s Undisputed Facts] ¶¶ 1-4.) He was hired as a semi-skilled laborer but had been promoted to the position of water distribution repair worker, which was his position when his employment with Defendant ended. (*Id.* ¶¶ 4-6.) Plaintiff was employed by Defendant for nearly twelve years and had been working as a repair worker in the PWD Shut-Off Unit for the five to ten years before his separation from Defendant. (*Id.* ¶ 6.)

During PWD's "shut-off season," which runs from April through November, Plaintiff was responsible for visiting PWD customers and either collecting payment from them or shutting off their water service. (*Id.* ¶¶ 7-8.) Plaintiff would receive a list of names and addresses throughout Philadelphia and would visit each address before the end of the day. Plaintiff also performed "restoration" work, which required him to reconnect water service at customers' homes. It was typical for employees in Plaintiff's position to be required to sit and wait for possible restoration work during the day. (Pl.'s Answer to Def.'s Undisputed Facts [hereinafter Opp'n] ¶ 172.) Plaintiff was not required to notify anyone that he had completed his assigned daily tasks, and he often sat in front of his own home when he was waiting for calls about restoration work. (Def.'s Undisputed Facts ¶¶ 41-44.) Plaintiff believes that this conduct was authorized by his supervisor. (*Id.* ¶ 45.) Plaintiff also went to his home during his working hours to eat lunch and to use the restroom. (*Id.* ¶ 43.)

At the heart of this dispute are the circumstances surrounding Plaintiff's retirement from PWD. On April 9, 2010, the Office of the Inspector General ("OIG"), which is empowered to investigate complaints regarding PWD employees, received a confidential complaint against Plaintiff. (*Id.* ¶¶ 17-20.) The complaint alleged that Thomas "comes home during the day in his PWD city vehicle and parks on his block and leaves it running for several hours. Thomas does personal errands, including going to the supermarket and picking up junk from the street and taking it to the salvage yard in his personal vehicle, while his city vehicle is parked on his block running for several hours at a time." (*Id.* ¶ 20.) The complaint also included details such as Plaintiff's license plate number, truck number, and home address. (*Id.*) The complaint was forwarded to the PWD human resources department, and then from Human Resources Manager Francis X. Meiers to Human Resources Associate Ivor Griffiths.

Griffiths investigated the complaint against Plaintiff. First, Griffiths spoke by phone with the confidential complainant, who stated that the complainant had observed Plaintiff at his house during business hours on at least three occasions. Based on this information, Griffiths conducted surveillance of Plaintiff during his working hours. Griffiths first visited Plaintiff's neighborhood accompanied by Meiers, but they did not observe Plaintiff.[1] (Opp'n ¶ 31.) On May 27, 2010, Griffiths was accompanied on his second visit by Peter Terry, another human resources associate. The two observed Plaintiff in his PWD vehicle near his residence for approximately thirty minutes to one hour. (Id. ¶¶ 32-34.) Griffiths called Plaintiff's supervisor, Ralph Allen, and instructed him to call Plaintiff and question him about his whereabouts. Allen called Plaintiff while Griffiths and Terry were in Plaintiff's neighborhood observing his truck. Allen then told Griffiths that Plaintiff had reported that he was at a restoration job in a neighborhood other than his own. (Id. ¶¶ 35-37.) Therefore, Plaintiff was then suspended pending a pre-disciplinary hearing. Plaintiff had not been previously accused of misbehavior. (Opp'n ¶ 177.)

On May 28, 2010, PWD informed Plaintiff by mail that a pre-disciplinary hearing would be scheduled to investigate "allegations that during recent weeks [he had] been repeatedly at home while [he was] supposed to be working." (Def.'s Mot. for Summ. J. Ex. 14.) The letter included boilerplate language informing Plaintiff that the PWD Commissioner received a recommendation that "severe disciplinary action be taken" against him, pending the resolution of the hearing. (Def.'s Undisputed Facts ¶¶ 53-55.) Plaintiff met with Jeff Gilliam, the business agent of his union, at the union offices on May 28, 2010. (Id. ¶ 56.) Gilliam coordinated with

---

[1] There is a dispute about what Griffiths and Meiers observed on this date. Griffiths reports that he and Meiers visited Plaintiff's home address on March 24, 2010, where Griffiths observed Plaintiff sleeping and leaving his PWD truck running for long periods of time. (Mot. for Summ. J. Ex. 8 ¶ 8.) Conversely, Meiers has no recollection of seeing Plaintiff on any surveillance trip. (Opp'n ¶ 31.) Because the Court must resolve all factual disputes and draw all reasonable inferences in favor of Plaintiff for the purpose of deciding this motion, the Court will assume that Griffiths and Meiers did not observe Plaintiff on that day.

Griffiths in setting June 10, 2010, as the date for Plaintiff's hearing. (*Id.* ¶ 59.) Plaintiff received a letter informing him of this date on June 9, 2010, and had not spoken with anyone from the union about this date. Therefore, Plaintiff had only one day's notice about the date of the hearing, which is not typical for PWD pre-disciplinary hearings. (Opp'n ¶ 175.)

Griffiths was responsible for conducting the hearing, and Meiers would act as the hearing officer. (Def.'s Undisputed Facts ¶ 63.) As hearing officer, Meiers's role was to consider to the evidence against Plaintiff and Plaintiff's explanation or defense, to decide whether he believed that the charges were supported by the evidence, and to make a recommendation to the PWD Commissioner regarding whether Plaintiff should remain in his current position, or whether another action such as termination or demotion should be taken. (*Id.* ¶¶ 54-55, 68.) On the day of the hearing, Gilliam was late and spoke very briefly with Plaintiff before conferring with Meiers and Griffiths in the hearing room, in Plaintiff's absence. (*Id.* ¶¶ 64-66.) Meiers advised Gilliam that he believed the evidence against Plaintiff was "very strong" but that he would hear the evidence before recommending a disciplinary action. (*Id.* ¶¶ 67-68.) Griffiths then advised Gilliam that the PWD would allow Plaintiff to voluntarily retire rather than proceed with the hearing and risk being fired. (*Id.* ¶ 70.)

After conferring with Meiers and Griffiths, Gilliam returned to the room where Plaintiff was waiting. Plaintiff requested a copy of the complaint against him, but Gilliam refused his request because the complaint listed the name of a confidential complainant. (Def.'s Undisputed Facts ¶ 74.) Meiers never lets employees see complaints against them before the commencement of a pre-disciplinary hearing. (*Id.* ¶ 171.) Gilliam then told Plaintiff that Plaintiff had been given the option to "be fired or retire." (*Id.* ¶ 77.)  Plaintiff told Gilliam that he chose to retire, and Gilliam re-entered the hearing room, accompanied by Plaintiff, and reported this decision to

Griffiths and Meiers. (*Id.* ¶¶ 78-80.) No hearing was held, and Plaintiff's retirement became effective on June 10, 2010. (*Id.* ¶¶ 81-84.)

After his retirement, Plaintiff contacted Griffiths asking to be reinstated. (*Id.* ¶ 85.) Griffiths did not respond to this request. (*Id.* ¶ 86.) Plaintiff left several messages for Gilliam in which Plaintiff requested that Gilliam file an appeal on his behalf, but these calls were not returned. (*Id.* ¶¶ 91-92.) Plaintiff contacted an attorney and the president of his union about the matter, but he ultimately received assistance from neither. (*Id.* ¶¶ 93-104). The Civil Service Regulations provide that an employee alleging that his resignation was involuntary may request a hearing within thirty days of the resignation. (*Id.* ¶ 88.) On September 19, 2010, Plaintiff filed an appeal with the Civil Service Commission on the grounds that his retirement had been involuntary. (*Id.* ¶ 106.) A hearing was held about the timeliness of his appeal on March 16, 2011, during which Plaintiff argued that he had filed an appeal on June 28, 2010. (*Id.* ¶¶ 113-18.) On March 31, 2011, the Commission dismissed Plaintiff's appeal as untimely. (*Id.* ¶ 124.)

On November 24, 2010, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"). Plaintiff claimed that he had been constructively discharged because of his race. (*Id.* Ex. 22.) Plaintiff subsequently filed the Complaint in this matter, alleging that the City discriminated against Plaintiff on the basis of his race in violation of 42 U.S.C. § 1983 and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*. On August 19, 2013, Defendant moved for summary judgment.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable factfinder to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).  A court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.     DISCUSSION

### A.     Affidavit of Ivor Griffiths

Before addressing the arguments raised in Defendant's motion, the Court must address an issue raised by Plaintiff in his Opposition to Defendant's Motion for Summary Judgment. Plaintiff asks the Court to strike the affidavit of Ivor Griffiths because Defendant "failed to produce Ivor Griffiths for deposition during the discovery period and failed to provide Plaintiff with a copy of the Affidavit of Ivor Griffiths prior to the expiration of the discovery deadline." (Opp'n 1.)

Plaintiff cites no law to suggest that Defendant was obligated to produce Griffiths, who was a human resources associate at PWD until 2010 but was not employed by Defendant at the time of this litigation. (Mot. for Summ. J. Ex. 8.) Defendant informed Plaintiff of this fact in its initial disclosures and again explained this fact in during discovery. (Def.'s Reply Ex. 1.) Thus, the Court declines to strike the affidavit on this ground.

It is also unclear why Plaintiff believes he should have been provided with a copy of Griffiths's affidavit. Plaintiff does not allege that he requested a copy of Griffiths's affidavit during discovery, and Defendant asserts that Plaintiff made no such request. (Def.'s Reply 2.) Additionally, Defendant fully complied with the requirements of Federal Rule of Civil Procedure 26, which states in relevant part that "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i). The Court can find no basis on which to strike Griffiths's affidavit, and thus declines to do so.

### B.    Plaintiff's *Monell* Claim

The Supreme Court's holding in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) precludes this Court from holding the City liable under § 1983 because Plaintiff has not identified a city policy or custom that caused his separation from PWD. *See Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Instead, Plaintiff asserts that the City should be held liable because of an action taken by Meiers. "[M]unicipal liability may be imposed for a single decision by municipal policymakers under

appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, those circumstances do not exist in this case.

A municipality may be held liable based on one person's decision only "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481-83. Plaintiff avers that "[c]onsidering his testimony in its entirely, there is no question that [Meiers] is a policymaker for the purposes of *Monell*. His discretionary decisions with respect to pre-disciplinary activities are not constrained by any City policy." (Opp'n 13.) However, Plaintiff proffers no evidence in support of this assertion. In fact, the evidence is that Meiers merely recommends an employment action to the Commission, which makes the ultimate decision. (Def.'s Undisputed Facts ¶¶ 54-55, 67-68.) Furthermore, even if Meiers were a policymaking official, he never made a recommendation of discipline regarding Plaintiff because no pre-disciplinary hearing was held. Thus, it is unclear which action Plaintiff believes is an exercise of discretion by a policymaking City official. Regardless, there is no evidence that Meiers has final authority to establish any policy related to Plaintiff's complaints. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (noting that "the mere exercise of discretion by an employee" does not create municipal liability); *Pembaur*, 475 U.S. 469, 481-83 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Plaintiff has not put forth any evidence to suggest that actions against him were the result of a City policy or custom, or that they were taken by a policymaking decisionmaker. Therefore, Plaintiff may not prevail on his § 1983 claim.

C.      **Plaintiff's PHRA Claim**

Plaintiff also claims that the City engaged in race-based employment discrimination in violation of the PHRA. Claims under the PHRA are analyzed under the same framework as Title VII claims. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995) ("The state [PHRA] is construed consistently with interpretations of Title VII."). A plaintiff asserting a PHRA claim is not required to introduce direct evidence of discrimination, but may prove his claim using circumstantial evidence that satisfies the framework first laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.* "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) [these events occurred] under circumstances that raise an inference of discriminatory action . . . ." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff meets this test, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment decision. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) If the defendant satisfies this burden, "[t]he third step in the *McDonnell Douglas* analysis shifts the burden of production back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.*

In this case, Plaintiff puts forward no direct evidence of discrimination and fails to establish a *prima facie* case of discrimination under *McDonnell Douglas*. The first two prongs of the test are not in dispute. Plaintiff is an African American and thus a member of a protected

group, and Defendant has stipulated to the fact that Plaintiff was qualified for his position for the purposes of its motion. However, Defendant argues that Plaintiff has not satisfied the third and fourth prongs of the test. The Court agrees.

  *1. Adverse employment action*

  Plaintiff initially framed his retirement as a constructive discharge. (Compl. ¶ 10.) He now argues that his "retirement, in and of itself, regardless of whether it was voluntary or involuntary, constitutes an adverse employment action because it resulted in a material change in the terms or conditions of his employment." (Opp'n 11.) However, Plaintiff goes on to assert that his retirement was, in fact, involuntary. (*Id.*) "[A]n adverse employment decision is one in which a discharge, refusal to rehire, or other action occurs that alters the employee's 'compensation, terms, conditions, or privileges of employment, or deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Siko v. Kassab, Archbold & O'Brien, LLP*, Civ. A. No. 98-402, 2000 WL 307247, at \*5 (E.D. Pa. Mar. 24, 2000) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). A retirement or resignation is said to be an "adverse employment action" when it amounts to a "constructive discharge." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1075 (3d Cir. 1996) ("[A] plaintiff who voluntarily resigned may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge.").

  However, Plaintiff contends that he is not required to prove that his retirement amounts to a constructive discharge. To the extent that Plaintiff asserts that the ultimatum given to him by his union representative amounts to an adverse employment action, the Court rejects this argument. Plaintiff indicates that Gilliam reported that PWD had given Plaintiff the option to "be

fired or retire." (Def.'s Undisputed Facts ¶ 77.) However, there is no indication that a PWD employee actually issued such an ultimatum, or that PWD directed Plaintiff's union representative to do so. Instead, there is evidence that a PWD employee told Plaintiff's union representative that Plaintiff could retire in lieu of continuing with the proceeding. (*Id.* ¶ 70.) Meiers expressed his opinion that the charges against Plaintiff were serious enough to warrant dismissal if substantiated, but told Gilliam that he would wait to hear the evidence against Plaintiff before recommending a disciplinary action. (*Id.* ¶¶ 67-68.) The evidence suggests that Plaintiff's retirement was, at worst, the result of incomplete advice from his union representative. Defendant did not take an adverse employment action against Plaintiff.

    2.    *Inference of discrimination*

Additionally, even if Plaintiff could prove that he was subject to an adverse employment action, there is no evidence to support the fourth requirement under *McDonnell Douglas*, that the action occurred under circumstances that give rise to an inference of discrimination. Plaintiff argues that procedural problems with the pre-disciplinary hearing, such as his short preparation time and the allegedly biased hearing officer, give rise to such an inference. With respect to Plaintiff's short preparation time, Defendant has put forward uncontested evidence that Plaintiff's union representative coordinated with Griffiths to set the date of the hearing. (Def.'s Undisputed Facts ¶ 59.) Plaintiff's short preparation time is attributable to his lack of communication with his union representative, and thus it raises no inference of race discrimination by Defendant. Additionally, there is no evidence to support Plaintiff's assertion that the result of the hearing was pre-determined or that the factfinder was biased against him. (*See* Opp'n 12.)

Plaintiff also claims that PWD treated similarly situated Caucasian employees differently than it treated Plaintiff. (Opp'n 12.) To establish the fourth element of the *prima facie* case, "the plaintiff may show . . . that the employer has treated more favorably similarly situated persons not within the protected class." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (citation omitted). A "similarly situated" person need not share all of the plaintiff's characteristics, but must be similar in material respects. For example, "[i]n order to determine who might qualify as a similarly situated employee [courts] must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004) (ruling on a claim under the New Jersey Law Against Discrimination, which is interpreted under the same framework as federal employment discrimination laws).

PWD's treatment of the Caucasian employees that Plaintiff identifies, John Streeper and Thomas Talorica, does not give rise to an inference of discrimination. First, Plaintiff argues that Defendant scheduled his pre-disciplinary hearing with "breath-taking" speed, (Opp'n 11.), and that Streeper's hearing was scheduled more slowly. There were two months between the date of the first complaint against Plaintiff and the date of his retirement, compared with one year between the beginning of the investigation against Streeper and his pre-disciplinary hearing. However, because Streeper was eventually fired, it cannot fairly be said that Defendant treated him more favorably than it treated Plaintiff simply because Streeper's firing process was longer. Furthermore, Streeper is not similarly situated because he was a supervisor and because he faced different charges than Plaintiff. (Def.'s Undisputed Facts ¶¶ 150-51.) Plaintiff also directs the Court to the disciplinary proceedings against Talorica, a Caucasian PWD employee who, similar to Plaintiff, was accused of being in an inappropriate location during business hours. Talorica

was demoted instead of being terminated or retiring. However, Talorica is not similarly situated for at least three reasons. First, Talorica had worked with PWD for twenty to twenty-five years, while Plaintiff was employed by PWD for twelve years. (Def.'s Undisputed Facts ¶¶ 145-47.) Second, Talorica was a supervisor, while Plaintiff was not. (*Id.*) Finally, Talorica contested the charges against him at his pre-disciplinary hearing, while Plaintiff chose to retire rather than proceed with his hearing. (*See id.*) The circumstances surrounding Plaintiff's retirement, even when viewed in the light most favorable to Plaintiff, cannot reasonably give rise to an inference of discrimination. Therefore, he cannot proceed with his PHRA claim of race-based employment discrimination.

## IV.    CONCLUSION

As Plaintiff has failed to proffer evidence that creates a genuine issue of material fact with respect to his claim of race-based employment discrimination, the Court grants summary judgment to Defendant on Plaintiff's claims under § 1983 and the PHRA. An Order consistent with this Memorandum will be docketed separately.